UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ERICKSON ANTHONY VARGAS,

      Plaintiff,

v.                                  Case No:  6:13-cv-1683-Orl-41TBS

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____

## REPORT AND RECOMMENDATION

Plaintiff Erickson Vargas brings this action pursuant to the Social Security Act

("Act"), as amended, 42 U.S.C. § 405(g), for judicial review of a final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying his claim

for Supplemental Security Income ("SSI") under the Act.   Plaintiff argues that the

administrative law judge ("ALJ") erred by: (1) failing to find that Plaintiff met the

requirements for Listing 12.05C in the Listing of Impairments, 20 C.F.R. part 404, subpart

P, appx. 1; (2) failing to account for Plaintiff's moderate difficulties in maintaining

concentration, persistence, and pace in his assessment of Plaintiff's residual functional

capacity; and (3) improperly rejecting the opinions of four doctors.   Based upon a review

of the administrative record and the pleadings and memoranda submitted by the parties,

and for the reasons that follow, I respectfully recommend that the Commissioner's final

decision be **REVERSED** and **REMANDED** for further proceedings consistent with the

findings in this report, pursuant to sentence four of 42 U.S.C. § 405(g).

### I. Background

Plaintiff is a 24-year old man with no employment history who has suffered from

intellectual, behavioral, and psychiatric problems for most of his life.   (Tr. 154, 510-11).

In July 2000, he was referred to a school psychologist for an IQ test because his teacher

reported that he was "working below grade level in Math and Reading, is often off task,

and requires constant supervision."   (Tr. 287-89).   Plaintiff attained a Verbal IQ of 63, a

Performance IQ of 74, and a Full Scale IQ of 66 on the Wechsler Intelligence Scale for

Children-III ("WISC-III").   (Id.).   In 2002, Plaintiff's father filed an application on Plaintiff's

behalf for supplemental security income ("SSI") benefits.   (Tr. 89 -105).   The

Commissioner granted Plaintiff's application and awarded him child SSI benefits, finding

that Plaintiff met Listing 112.11, Attention Deficit Hyperactivity Disorder.   (Tr. 26).

After Plaintiff turned 18, the Commissioner reviewed whether Plaintiff was eligible

for adult SSI benefits under the Act.   (Tr. 27-28).   State agency disability examiners both

initially and on reconsideration found that Plaintiff's disability ended when he reached 18

years of age.   (Id.).   At Plaintiff's request, the Commissioner convened a hearing before

ALJ John D. Thompson, Jr., on December 7, 2010.   (Tr. 473A-530).   At the hearing, the

ALJ heard testimony from Plaintiff, his mother, and medical and vocational experts.   (Id.).

The ALJ found Plaintiff not disabled and denied his application for benefits in a written

decision dated January 31, 2011.   (Tr. 14-24).   The Appeals Council denied Plaintiff's

request for review and he sought relief from this Court.   Complaint (Doc. 1), Vargas v.

Commissioner, Case No. 6:12-cv-00358-TBS (M.D. Fla. 2012).   The Commissioner

answered the complaint and filed the transcript, but moved for remand after Plaintiff filed

his brief.   See Id., Unopposed Motion to Remand (Doc. 22).   On September 6, 2012, the

Court granted the Commissioner's motion.   Id., Order Granting Government's Motion to

Remand (Doc. 23).   Quoting from the motion, the Order directed the ALJ on remand to

"1) update the medical evidence; 2) reevaluate the Plaintiff's residual functional capacity

... and rearticulate the basis in the record for the residual functional capacity; and 3) if necessary ... hold a supplemental hearing and pose a question to the vocational expert (VE) that includes all limitations as found in the psychiatric review technique form (PRTF) to clarify the effect of any functional limitations on the occupational base." Id.

On remand, the Commissioner convened another hearing before ALJ Thompson. (Tr. 640-91).   At this hearing, the ALJ took testimony from Plaintiff; his mother; an independent medical expert, Dr. Adam Cox; and a vocational expert, Jackson McKay. (Id.).   The ALJ issued his decision on August 29, 2013, once again finding Plaintiff not disabled.   (Tr. 534-46).

The ALJ employed the five step sequential evaluation process which appears at 20 C.F.R. § 416.920 to evaluate Plaintiff's claim.[1]   At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date.   (Tr. 536). At step two, the ALJ concluded that Plaintiff was severely impaired by "a history of borderline IQ."   (Id.).   At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (Tr. 536-41).

Next, the ALJ found that since July 1, 2009, Plaintiff has had the residual functional capacity to perform work at all exertional levels with the following nonexertional limitations: he can perform "simple rote and repetitive tasks in response to oral

---

[1] The five steps are summarized as follows:
1. Is the claimant performing substantial gainful activity?
2. Does the claimant have a severe impairment?
3. Does the claimant have a severe impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1?
4. Can the claimant perform past relevant work?
5. Based on the claimant's age, education, and work experience, can the claimant perform other work of the sort found in the national economy?

directives;" he cannot tolerate changes in work duties from one day to the next; he cannot meet "any kind of strict production goal or quota;" he cannot be in proximity to or interact with members of the public; he can have "transitory up to occasional contact with co-workers or supervisors;" and he "would work better with things as opposed to other people."  (Tr. 541).   At step four, the ALJ found that Plaintiff had no past relevant work. (Tr. 544).   At step five, relying on the testimony of the vocational expert, the ALJ found that Plaintiff could perform work as a kitchen helper, laundry sorter, cleaner, packager, and maintenance worker, and that these jobs exist in significant numbers in the national economy.   (Tr. 545).   Based on these findings, the ALJ found Plaintiff not disabled. (Tr. 546).   The ALJ's decision became the Commissioner's final decision after 60 days passed without action from the Appeals Council.   See 20 C.F.R. § 416.1484.

## II. Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether the ALJ's findings are supported by substantial evidence.   Crawford v. Commissioner, 363 F.3d 1155, 1158 (11th Cir. 2004).   The Commissioner's findings of fact are conclusive if supported by substantial evidence.   42 U.S.C. § 405(g).   Substantial evidence is "more than a scintilla but less than a preponderance.   It is such relevant evidence that a reasonable person would accept as adequate to support a conclusion."   Winschel v. Commissioner, 631 F.3d 1176, 1178 (11th Cir. 2011) (citation omitted).

When the Commissioner's decision is supported by substantial evidence, the district court will affirm even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the preponderance of the evidence is against the Commissioner's decision.   Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996).

The district court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner.]"   Id.   "The district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (per curiam); accord Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (the court must scrutinize the entire record to determine the reasonableness of the factual findings).

There is a presumption in favor of the ALJ's findings of fact, but the presumption does not attach to the ALJ's conclusions of law.   Welch v. Bowen, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam).   The Court will reverse a final decision if the ALJ incorrectly applied the law or failed to provide sufficient reasoning for the Court to determine whether the ALJ properly applied the law.   Keeton v. Dep't of Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1992).   When it reviews the Commissioner's final decision, the Court is authorized to "enter ... a judgment affirming, modifying, or reversing the decision ... with or without remanding the cause for a hearing."   42 U.S.C. § 405(g).

### III. Discussion: Listing 12.05C

This case turns on the ALJ's finding at step three that Plaintiff did not meet Listing 12.05C in the listing of impairments.   "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'"   Sullivan v. Zebley, 493 U.S. 521, 532 (1990); 20 C.F.R. § 416.925(a).   They "streamline[ ] the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background."   Bowen v. Yuckert, 482 U.S. 137, 153 (1987).   An impairment meets a listing if it "satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the [one-year]

duration requirement." 20 C.F.R. § 416.925(c)(3).   An impairment or combination of impairments "is medically equivalent to a listed impairment ... if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). The claimant bears the burden of demonstrating that his or her impairment meets or equals a medical listing. Yuckert, 482 U.S. at 146 n.5.

Listing 12.05 addresses intellectual disability.[2]   The preamble to the listing explains that "intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of impairment before age 22." A claimant with intellectual disability can meet Listing 12.05 by meeting the preamble and, in addition, satisfying the criteria in one of the four paragraphs contained in the listing.   The paragraph relevant to this case, Paragraph C, requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."   I address each of these requirements in turn.

A. "Significantly subaverage general intellectual functioning with deficits in adaptive functioning during the developmental period"

The introductory paragraph of Listing 12.05 defines intellectual disability as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence

---

[2] Listing 12.05 formerly referred to "mental retardation," the term used by the ALJ in his decision. However, on August 1, 2013, the Commissioner amended the listings to replace "mental retardation" with "intellectual disability." See Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46,499; see also Hall v. Florida, 134 S. Ct. 1986, 1990 (2014) (explaining that medical professionals prefer the term "intellectual disability" to "mental retardation"); Rosa's Law, 124 Stat. 2643 (changing entries in the U.S. Code from "mental retardation" to "intellectual disability"). This report and recommendation uses the term "intellectual disability," except in quotations from the record and case law.

demonstrates or supports onset of impairment before age 22."   To qualify for disability benefits under any paragraph of Listing 12.05, the claimant must "(1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive functioning; and (3) have manifested deficits in adaptive behavior before age 22."   Pettus v. Astrue, 226 Fed. Appx. 946, 948 (11th Cir. 2007) (citing Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir. 1997)).   The three-pronged definition of intellectual disability in Listing 12.05 parallels the three criteria in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) ("DSM-V"): deficits in intellectual functions, deficits in adaptive functioning that result in failure to meet developmental and socio-cultural standards for personal independence and social responsibility, and onset of intellectual and adaptive deficits during the developmental period.   Id. at 33.

The first criterion in the definition of intellectual disability has traditionally been measured by tests of intelligence, with a score at least two standard deviations below the mean considered necessary for a diagnosis.   See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 49 (4th ed., text rev. 2000) ("DSM-IV-TR") (defining "significantly subaverage intellectual functioning" as "an IQ of approximately 70 or below on an individually administered IQ test"); American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 36–37 (3d ed. 1980) ("Significantly subaverage intellectual functioning is defined as an IQ of 70 or below on individually administered IQ test.").   Listing 12.05 adopts this score-based approach to measuring intellectual ability.[3]   Unless a claimant is so severely incapacitated that an IQ

---

[3]  In recent years, the medical community has shifted away from a score-based definition of intellectual disability to a more holistic approach that "emphasize[s] the importance of clinical assessment of intellectual and adaptive functioning."   Brief of American Psychological Association et al. as Amici Curiae Supporting Petitioner, Hall v. Florida, 134 S. Ct. 1986 (2014) (No. 12-10882), available at http://www.americanbar.org/content/dam/aba/publications/supreme_court_preview/briefs-v2/12-

test cannot be administered (Listing 12.05A), the claimant must have a "valid verbal, performance or full scale IQ score" of 70 or less in order to meet Listing 12.05 under paragraphs B, C, or D.   The introductory material to the mental disorder listings does explain that "the results of intelligence tests are only part of the overall assessment," and that the examiner "should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation."   Listing 12.00D6a.   But the next paragraph emphasizes that "[s]tandardized intelligence results are essential to the adjudication of all cases of intellectual disabilities that are not covered under the provisions of 12.05A."   Reversal is required because the ALJ's rejection of

---

10882_pet_amicus_apa.authcheckdam.pdf.   The DSM-V explains that "[i]ndividuals with intellectual disability have scores of approximately two standard deviations or more below the population mean," but cautions that "IQ test scores are approximations of conceptual functioning" that "may be insufficient to assess reasoning in real-life situations and mastery of practical tasks."   Id. at 37.   Interpreting test results thus requires clinical training and judgment.   Id.

   The Supreme Court recognized this shift in medical opinion in Hall, when it struck down a Florida statute that required an individual to have an IQ score of 70 or below to avoid execution on the grounds of intellectual disability. 134 S. Ct. 1991-92, 2001.   The Court held this bright-line unconstitutional because it "create[d] an unacceptable risk that persons with intellectual disability will be executed."   Id. at 1990.   In its decision, the Court explained that:

> [i]ntellectual disability is a condition, not a number. Courts must recognize, as does the medical community, that the IQ test is imprecise. This is not to say that an IQ test score is unhelpful. It is of considerable significance, as the medical community recognizes. But in using these scores to assess a defendant's eligibility for the death penalty, a State must afford these test scores the same studied skepticism that those who design and use the tests do, and understand that an IQ test score represents a range rather than a fixed number. A State that ignores the inherent imprecision of these tests risks executing a person who suffers from intellectual disability.

Id. at 2001.
   The Listings, however, were created under the old framework, under which "significantly subaverage intellectual functioning" was "defined" as an IQ score at least two standard deviations below the mean.   See Technical Revisions to Medical Criteria for Determinations of Disability, 67 F.R. 20018-01, 20022 (Apr. 24, 2002) (citing definitions published by the American Psychiatric Association in the DSM-IV and the American Psychological Association in its Manual of Diagnosis and Professional Practice in Mental Retardation, 1996).   The Commissioner is considering revisions to the listings which would "put[] more emphasis ... on the need to confirm the validity of test results with other evidence, especially of a person's day-to-day functioning."   Notice of Proposed Rulemaking, Revised Medical Criteria for Evaluating Mental Disorders, 75 F.R. 51446-01, 51340 (Aug. 19, 2010).   The NPRM explains that the proposed approach "is more in keeping with modern definitions of [intellectual disability], especially the 2010 edition of the AAIDD manual, which emphasized the 'multidimensional' aspects of defining [intellectual disability]."   Id.   But, these proposed changes have not yet been adopted.

Plaintiff's IQ scores in this case is not supported by substantial evidence.   <u>See</u> <u>infra</u> Part III.B.

The ALJ did not make any findings in his decision addressing whether Plaintiff had deficits in adaptive functioning that were initially manifested before age 22.   But the evidence unequivocally shows that he did.   Plaintiff was repeatedly hospitalized during his childhood after threatening to harm himself or others.   (<u>See</u> Tr. 348, 417). Assessments of Plaintiff's behavior completed by a guidance counselor and a behavior specialist at Volusia County Public Schools placed Plaintiff in the 99th percentile for behavioral symptoms.   (Tr. 342).   Plaintiff complained to medical providers that he had no good friends and also complained of hopelessness and helplessness.   (Tr. 373).   <u>Cf.</u> <u>Black v. Astrue</u>, 678 F. Supp. 2d 1250, 1261-62 (N.D. Fla. 2012) (finding that claimant showed "deficits in adaptive functioning initially manifested during the developmental period" as a matter of law).

### B. "A valid verbal, performance, or full scale IQ of 60 through 70"

To meet Listing 12.05C, a claimant must present a valid verbal, performance, or full scale IQ score that is between 60 and 70, inclusive.   Plaintiff's IQ has been tested on three occasions, most recently in June 2009 by Dr. Malcolm Graham, who was hired by the state agency to conduct a consultative mental examination of Plaintiff.   (Tr. 430-34). Dr. Graham administered the Wechsler Adult Intelligence Scale-III ("WAIS-III").[4] (Tr. 432).   Plaintiff scored a Verbal Scale IQ of 66, a Performance Scale IQ of 73, and a

---

[4] The WAIS-III consists of 14 subtests.   Each subtest is scored individually, and the subtest score is then converted to a scaled subtest score.   Scaled scores from eleven of the subtests are combined and standardized to yield Full Scale IQ.   Verbal and Performance IQ scores are obtained by combining and standardizing scaled scores from six and five of these subtests, respectively.   Smaller groups of subtests are combined to yield index scores for Verbal Comprehension, Working Memory, Perceptual Organization, and Processing Speed.   <u>See</u> Cecil R. Reynolds & Elaine Fletcher-Janzen, 3 <u>Encyclopedia of Special Education</u> 2129 (3d ed. 2007).

Full Scale IQ of 66.   (Id.).   Dr. Graham noted that Plaintiff obtained Index Scores of 70 for Verbal Comprehension and 72 for Perceptual Organization; he did not separately provide Plaintiff's Working Memory Index and Processing Speed Index scores.   (Id.). Dr. Graham added that, "overall," he felt Plaintiff's "Summary Index Scores are more indicative of his present level of intellectual functioning than are his Verbal Scale IQ and Performance Scale IQ."   (Tr. 433).

Plaintiff's IQ was evaluated using the WISC-III and WISC-IV on two occasions during his childhood.   As noted above, in 2000, Plaintiff attained a Verbal IQ of 63, a Performance IQ of 74, and a Full Scale IQ of 66 on the WISC-III.   (Tr. 286).   In 2003, Plaintiff attained Summary Index Scores of 71 for Verbal Comprehension, 84 for Perceptual Reasoning, 77 for Working Memory, and 75 for Processing Speed, for a Full Scale IQ of 71 on the WISC-IV.[5]   (Tr. 264).   The record does not contain Summary Index Scores for the 2000 test.

The evidence shows that Plaintiff meets Listing 12.05C's requirement of "[a] valid verbal, performance, or full scale IQ of 60 through 70" as a matter of law.   He attained a Verbal Scale IQ of 63 and a Full Scale IQ of 66 on the WAIS-III administered by Dr. Graham in June 2009.   (Tr. 432).   Although Dr. Graham expressed his opinion that Plaintiff's Verbal and Full Scale IQ scores underestimated his actual level of intellectual functioning, the doctor never expressed doubt about the validity of the scores, and none of the three other doctors who reviewed Dr. Graham's evaluation suggested that

---

[5] The WISC-IV does not include "verbal" or "performance" IQ sub-scores.   However, the WISC-IV Verbal Comprehension Index is equivalent to the WISC-III Verbal Scale IQ, and the WISC-IV Perceptual Reasoning Index is equivalent to the WISC-III Performance IQ.   See Isaac ex rel. JDM v. Astrue, No. CA 1:12-00097-C, 2012 WL 5373435, at *3-4 (N.D. Ala. Oct. 30, 2012).

Plaintiff's scores might be invalid.   In fact, at the two administrative hearings, Dr. Hamrick and Dr. Cox testified that the scores were valid.   (Tr. 487, 649).

Despite the absence of any doubt about the validity of Plaintiff's IQ score, the ALJ brushed the test results aside as unrepresentative of Plaintiff's actual level of intellectual functioning.   In applying the first prong of paragraph C in his opinion, the ALJ noted Plaintiff's 2009 WAIS-III and 2003 WISC-III scores, but not his 2000 WISC-III scores. (Tr. 537).   The ALJ observed that Plaintiff obtained Summary Index Scores of 70 in Verbal Comprehension and 72 in Perceptual Organization during the 2009 evaluation, and that Dr. Graham had written in his report, "Overall, it is felt that [the claimant's] Summary Index Scores are more indicative of his present level of intellectual functioning than are his Verbal Scale IQ and Performance Scale IQ."   (Id.).   The ALJ said he concurred with Dr. Graham's opinion that Plaintiff is functioning in the borderline range of intelligence, and reasoned that Plaintiff's IQ scores were not conclusive because they were "inconsistent with other evidence in the record, including a prior intelligence test as well as his activities of daily living and behavior."   (Id.).   As further support for this conclusion, the ALJ noted Dr. Cox' testimony at the second hearing that Plaintiff would be capable of "perform[ing] simple rote and repetitive work that involves the opportunity for close supervision, reasonable structure, no interaction with the public and not involving complex independent decision-making."   (Id.).

The Commissioner defends the ALJ's decision by pointing to case law holding that an ALJ is entitled to impeach an IQ score that falls within the applicable range for a listing when other evidence in the case is inconsistent with the IQ score.   (Doc. 20, pp. 7-9 (citing Smith v. Commissioner, 535 Fed. Appx. 894 (11th Cir. 2013); Jordan v. Commissioner, 470 Fed. Appx. 766 (11th Cir. 2012); Harris v. Commissioner, 330 Fed.

Appx. 813 (11th Cir. 2009)).   These are all unpublished decisions and therefore not

binding authority, <u>see</u> Eleventh Circuit Rules 36-2, 36-3, although there is binding

authority that supports the proposition that an ALJ may disregard an IQ score in the face

of conflicting evidence.

In <u>Popp v. Heckler</u>, 779 F.2d 1497 (11th Cir. 1986), the seminal case on this point,

an ALJ found that a claimant did not meet Listing 12.05C, even though the claimant had

obtained scores of 69 for Performance IQ, 79 for Verbal IQ, and 73 for Full Scale IQ on

the Wechsler Adult Intelligence Scale-Revised, an earlier version of the WAIS.   <u>Id.</u> at

1499.   Since the listings require the ALJ to use the lowest score among verbal,

performance, and full-scale IQ in applying Listing 12.05C, the Eleventh Circuit explained

that, "if believed," the claimant's Performance IQ score of 69 "should be the IQ score used

in applying Listing 12.05(C)."   <u>Id.</u> at 1499.   The court said the listings require the ALJ to

consider not only the IQ test scores, but also the report accompanying the scores, and to

"examine [the scores] to ensure consistency with daily activities and behavior."   <u>Id.</u>   It

found that substantial evidence supported the ALJ's finding that the claimant was not

mentally retarded.   <u>Id.</u> at 1499-1500.   The claimant, the court noted, "was close to

completing the requirements for a bachelor of science degree and had a history of having

taught high school algebra. ... The ALJ properly found this to be inconsistent with a

finding of mental retardation."   <u>Id.</u>   In addition, there was evidence suggesting that the

claimant had engaged in malingering and exaggeration.   <u>Id.</u> at 1500.

In <u>Smith</u>, one of the unpublished cases cited in the Commissioner's brief, the court

held that substantial evidence supported the ALJ's finding that the claimant's IQ score of

59 was invalid.   535 Fed. Appx. at 897.   The physician who administered the IQ test

noted that the claimant put forth limited effort and appeared to be fatigued during the test,

and that the results consequently underestimated her intelligence.   Id.   The court also

noted that the claimant's treatment records did not support her claim that she was

mentally retarded, a claim which the court observed was of suspiciously recent vintage.

Id. (noting that the claimant "did not claim disability due to mental retardation until a

consultative examination conducted after her hearing in front of the ALJ").   Finally, the

claimant had previously reported that "she had no problems in school and was average

intelligence, and denied having any problems with abstraction, problem solving, or

thought processes."   Id.

Courts have upheld ALJ decisions rejecting IQ scores in the face of evidence that

plainly conflicted with an otherwise qualifying score.   See, e.g., Jackson v. Colvin,

No. 2:12-cv-0190-CLS, 2013 WL 1909405 (N.D Ala. May 6, 2013) (claimant graduated

high school taking general education classes; prior employment as cook; claimant had

driver's license; complaints of vision problems during test may have affected results);

Beasterfeld v. Astrue, No. 8:10-cv-0979-T-30EAJ, 2011 WL 2632075 (M.D. Fla. Jun. 2,

2011) (driver's license; prior employment working ice cream truck; nine-year marriage);

Bischoff v. Astrue, No. 07-60969-CIV, 2008 WL 4541118 (S.D. Fla. Oct. 8, 2009)

(claimant had history of semiskilled to skilled work, supervisory work; evidence of

malingering); Lyons v. Astrue, No. 2:08-cv-614-FtM-29SPC, 2009 WL 1657388 (M.D. Fla.

Jun. 10, 2009) (claimant graduated high school without taking special education classes;

significant work history; evidence of malingering); Outlaw v. Barnhart, 197 Fed. Appx. 825

(11th Cir. 2006) (significant work history); Brown v. Astrue, No. CV608-036, 2009 WL

2135005 (S.D. Ga. Jul. 15, 2005) (history of supervisory and skilled/semiskilled work).

The sort of conflicting evidence relied upon in these cases is absent from Plaintiff's case.

Although the ALJ found that Plaintiff's IQ scores were "inconsistent with ... his activities of daily living and behavior," the ALJ did not explain why.   (Tr. 537).   In her brief, the Commissioner points out that Plaintiff "spends most of his day watching TV, playing games on his X-Box, riding his bike with his cousin, playing with his sister, and helping his mother clean an office.   On the weekends, he engages in family activities, goes to his uncle's house, watches TV or a DVD, and helps his grandmother around the house."   (Doc. 20, p. 8).   None of these activities are inconsistent with intellectual disability.   Nor is Plaintiff's apparently brief history of volunteer activity at a hospital. See Anderson v. Astrue, No. 4:10-CV-91 PPS, 2011 WL 4899990, at *8 (N.D. Ind. Oct. 14, 2011) ("[P]ut in proper context, the fact that Anderson can count change, volunteer at a nursing home, and perform chores around the house is not necessarily persuasive evidence of Anderson's intellectual ability.").

It is true that Dr. Graham said he thought Plaintiff's Summary Index Scores of 70 for Verbal Comprehension and 72 for Perceptual Organization were "more indicative of his present level of intellectual functioning" than his IQ scores, and that he thought Plaintiff was "probably functioning more in the borderline range of intellectual functioning rather than the mild range of mental retardation."[6]   (Tr. 433-34).   Setting aside the fact that one of Plaintiff's Summary Index Scores itself fell into the 12.05C range, Dr. Graham's opinion does not provide a rationale for disregarding Plaintiff's IQ scores.   To reiterate, Dr. Graham never said Plaintiff's test scores were invalid, and he favorably cited two of the summary index scores which represent Plaintiff's performance on portions of

---

[6] According to the DSM-IV-TR, "mild mental retardation" corresponds with an IQ from "50-55 to approximately 70," while "borderline intellectual functioning" corresponds with an IQ from 71 and 84.   DSM-IV-TR 41-42, 740.   The DSM-V, consistent with its de-emphasis of IQ scores, defines severity levels of intellectual disability based on adaptive functioning.   DSM-V 33-36.   The DSM-V does not define "borderline intellectual functioning."

the IQ test. Nor did Dr. Graham give any indication that Plaintiff's scores were affected by factors other than his intellectual ability, such as malingering, fatigue, or vision problems during the test.

Importantly, Dr. Cox, the medical expert who testified at the second hearing opined that Dr. Graham "overstep[ped] his clinical boundaries" and "d[id] not have any clinical protocol for making that decision." As Dr. Cox explained,

> [Dr. Graham is] basically saying that, you know, I'm a better interpreter of the test than are the standards and validation methods, which are widely accepted for understanding what these IQ scores mean. So I don't see what his grounds are for invalidating what the actual test says based on its number and then simply subjectively saying that I think we should instead infer that [Plaintiff's] IQ is best being understood as being a function of just a subset of the IQ scores rather than a totality of the IQ scores. Because that's precisely what he's done.

(Tr. 652-53).[7]

Plaintiff's scores on the WISC-IV administered in 2003, when he was 13 years old, provide no basis for rejecting his 2009 scores. The full-scale IQ score is only a single point above the range specified in Listing 12.05C for mild intellectual disability. Even if, in the absence of supporting medical evidence, the Court accepts the assumption that Plaintiff's score on this IQ test administered at age 13 is a valid and reliable indicator of his intelligence at age 19, it still is not inconsistent with the later score, once the tests' standard error of measurement is accounted for. Cf. Hall, 134 S. Ct. at 1995. Additionally, while relying on the ten-year-old IQ test from 2003 to impeach the 2009

---

[7] In fact, the Summary Index scores tend to be less reliable than IQ subscores (particularly Verbal Scale IQ) or Full Scale IQ scores. See Randy W. Kamphaus, Clinical Assessment of Child and Adolescent Intelligence 299-300 (2d ed. 2005). This is due to the fact that Summary Index scores are based on fewer tests than the IQ subscores or the Full-Scale IQ score.

score, the ALJ ignored the results from the 2000 test, which also showed Plaintiff in the mild intellectual disability range, without explaining why.

As the agency itself recognizes, intelligence tests administered to children tend to be less reliable than those performed on adults.   See Social Security Administration, Program Operations Manual System (POMS) DI 24515.055.   Indeed, as a general rule IQ scores obtained before the age of 16 are considered current only for two years.   Id. Plaintiff's 2003 IQ scores were six years old when he was tested in 2009, and ten years old when the ALJ issued his final decision.   Consequently, the 2003 scores do not provide substantial evidence to support the ALJ's decision to reject the 2009 IQ scores. Nor does any of the other evidence the ALJ cited in his decision.   Therefore, I find the ALJ's rejection of Plaintiff's IQ scores was not supported by substantial evidence.

### C. "A physical or other mental impairment imposing an additional and significant work-related limitation of function"

A claimant suffering from intellectual disability who has a valid IQ score between 60 and 70, inclusive, is entitled to benefits if he has an additional physical or mental impairment that "impos[es] an additional and significant work-related limitation of function."   Listing 12.05C.   The test for whether an impairment "impos[es] an additional and significant work-related limitation of function" is the same as the test for severity at step two of the Commissioner's five-step process.   Listing 12.00A.   The severity standard is very forgiving–an impairment qualifies as long as it is more than "a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."   Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984).

The ALJ found that "there is no physical or mental impairment imposing an additional significant work-related limitation of function–during the time period at issue." (Tr. 539).   To support this finding the ALJ pointed to Plaintiff's failure to seek or obtain any mental health treatment or take any psychotropic medication since July 2009 and the absence of evidence of "any suicidal, destructive, or physically aggressive behavior over the past two years."   (Id.).   Lastly, the ALJ noted that Plaintiff had expressed a desire to "work in a cafeteria or custodial type position."   (Id.).[8]

The ALJ's analysis of this prong is infected with error.   First, the ALJ erred by ignoring pre-2009 evidence and insisting that Plaintiff make his case based solely on the very limited medical records that post-date 2009.   The law is clear that an ALJ may not ignore evidence simply because it did not come into existence during the period subject to adjudication.   See Meade v. Astrue, No. 8:12-cv-00287-T-17MAP, 2013 WL 599116, at *6 (M.D. Fla. Jan. 23, 2013) (remanding disability insurance case where ALJ failed to address evidence post-dating claimant's date last insured).   Plaintiff's medical records prior to July 2009 show diagnoses of mood disorder, not otherwise specified; attention deficit hyperactivity disorder, by history; bipolar disorder; and intermittent explosive disorder. (Tr. 345, 347, 420).   In 2008 alone, he was prescribed Seroquel (high-dose, according to Dr. Cox, see Tr. 655), Abilify, and Lamictal.   (Tr. 420, 425, 426).

The ALJ also failed to address Dr. Cox' testimony addressing this issue.   At the hearing, Dr. Cox noted that in 2008 Plaintiff "was prescribed 100 milligrams of Seroquel,

---

[8]   The ALJ did not address Plaintiff's obesity in this part of his analysis; however, at step 2, he found Plaintiff's obesity non-severe.   (Tr. 536).   Plaintiff does not assign this finding as error.   I note however, that in his previous decision, the ALJ found Plaintiff's obesity to be severe.   (Tr. 16).   This leaves me to wonder why the ALJ changed his mind on this issue.   The ALJ's reversal on this point "at least suggests an improper attempt to justify, by whatever means necessary, a preordained conclusion that [Plaintiff] was not disabled."   Calderon v. Astrue, 683 F. Supp. 2d 273, 278 (E.D.N.Y. 2010).

which is a high dose antipsychotic.   And so this is roughly a year before the relevant date, and this is consistent with a history of kind of bipolar symptomatology.   And so I would have to assume then that all symptomatology related to an affective disorder has abated, but I mean I doubt that is true. ... [I]t seems to me that there is pretty strong evidence that there's a history of an affective disorder that in all likelihood would have continued into 2009."   (Tr. 655).   Dr. Cox's testimony that recovery was improbable further undermines the ALJ's finding that Plaintiff did not suffer from an additional severe impairment, particularly in light of the fact that the ALJ's finding is based in large part not on the evidence from the relevant period, but on the lack of evidence from the relevant period.

The ALJ's insistence on post-July-2009 evidence is ironic given his reliance on pre-July-2009 evidence at several points in his opinion.   For example, the ALJ used Plaintiff's childhood IQ test from 2003 to discredit the 2009 IQ test.   (Tr. 537).   In the RFC assessment, the ALJ used the same IQ test to bolster Dr. Graham's opinion that Plaintiff was capable of working.   (Tr. 543).   Likewise, the ALJ pointed to Plaintiff's failure to follow up with mental health treatment professionals in September 2008 in support of his finding that Plaintiff's "lack of insurance is not a credible basis for his lack of mental health treatment."   (Tr. 542).   But at the hearing, the ALJ admonished Plaintiff's mother to "try to confine [her] testimony to the last four years since July of 2009," before asking her "Why haven't you sought out any treatment for him since that time?" (Tr. 681).   Thus it appears the ALJ was willing to consider evidence from before July 2009, so long as it hurt Plaintiff's case.

Finally, the ALJ erred in relying on Plaintiff's failure to seek mental health treatment and take prescribed medications to discount the severity of his mental

impairments without adequately refuting the explanations Plaintiff and his mother

provided for these failures.   In a Social Security disability case, an ALJ may consider a

claimant's failure to seek medical treatment or follow a prescribed course of treatment for

two distinct purposes.   First, a claimant who, for no "good reason," fails to follow

prescribed treatment and is unable to work as a result, will be found "not disabled" under

the Act if the treatment "can restore [the claimant's] ability to work."   20 C.F.R.

§ 416.930(a).   Second, a claimant's failure to seek treatment or comply with prescribed

treatment may be evidence that the claimant's subjective symptoms are not as severe as

the claimant alleges.   20 C.F.R. § 416.929(c)(3)(v); SSR 96-7p, 1996 WL 374186, at *7

(July 2, 1996).   This case falls into the second category.

Social Security Ruling 96-7p explains how a claimant's record of seeking medical

treatment and following a prescribed course of treatment bears on the credibility of the

claimant's symptoms:

> In general, a longitudinal medical record demonstrating an
> individual's attempts to seek medical treatment for pain or
> other symptoms and to follow that treatment once it is
> prescribed lends support to an individual's allegations of
> intense and persistent pain or other symptoms for the
> purposes of judging the credibility of the individual's
> statements.   Persistent attempts by the individual to obtain
> relief of pain or other symptoms, such as by increasing
> medications, trials of a variety of treatment modalities in an
> attempt to find one that works or that does not have side
> effects, referrals to specialists, or changing treatment sources
> may be a strong indication that the symptoms are a source of
> distress to the individual and generally lend support to an
> individual's allegations of intense and persistent symptoms.

Id. at *7.

By contrast, a claimant's testimony "may be less credible if the level or frequency

of treatment is inconsistent with the level of complaints, or if the medical reports or

records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." Id. This is especially true where the symptom in question causes the individual a great deal of distress. For example, where the claimant alleges disabling pain, failure to seek treatment "may be probative of credibility, because a person's normal reaction is to seek relief from pain, and because modern medicine is often successful in providing some relief." Orn v. Astrue, 495 F.3d 625, 638 (9th Cir. 2007).

Before using noncompliance failure to seek treatment to discredit the claimant, the ALJ must "first consider[] any explanations that the individual may provide" and any "other information in the case record[] that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 97-7p, at *7. Good reasons for not seeking medical treatment include, but are not limited to, inability to afford medical care, aversion to side-effects of treatment, unavailability of any effective treatment options, and religious opposition to medical treatment. Id. at *8. When a claimant alleges symptoms relating to mental illness, the ALJ should consider the impact of the Plaintiff's mental illness itself on the claimant's failure to seek treatment. Sparks v. Barnhart, 434 F. Supp. 2d 1128, 1135-36 (N.D. Ala. 2006) (citing Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996)); see also Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir. 1989) ("[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.").

Plaintiff presented at least two reasons which, if accepted, excuse his failure to seek medical treatment or to comply with prescribed treatment. First, his mother testified that since Plaintiff lost Medicaid eligibility in 2009, she has not been able to afford mental health treatment for him. (Tr. 674, 681). Second, Plaintiff's mother testified that the

medications her son was prescribed did not work very well and caused him to suffer unpleasant side-effects, such as sleepiness.[9]  (Tr. 510, 511, 518-19, 681).

In his decision, the ALJ found that "lack of insurance is not a credible basis for [Plaintiff's] lack of mental health treatment," solely because Plaintiff did not follow up with mental health treatment providers in September 2008, at which time he was covered under Medicaid.  (Tr. 542).  In essence, the ALJ reasoned that if Plaintiff had been able to afford mental health treatment after July 2009 he would not have sought it.  But, at the second hearing, Plaintiff's mother testified that she made persistent efforts to obtain mental health treatment for her son after July 2009, including applying for Medicaid for him every year (Tr. 674), seeking medical treatment through vocational rehabilitation (Tr. 681), and applying for a clinic card at the Volusia County Department of Mental Health (Tr. 681-82).  The ALJ did not discuss this testimony, which undermines his unstated inference that Plaintiff still would not have obtained medical treatment even if it was available.  This was error, the ALJ has a duty to confront contrary evidence, not ignore it.  See McCruter v. Bowen, 791 F.2d 1544, 1548 (11th Cir. 1986).

The ALJ did not address Plaintiff's mother's testimony about the ineffectiveness and side-effects of his medication.  Yet, the ALJ expressly drew the inference that Plaintiff's medication noncompliance "suggests that the symptoms may not have been as limiting as the claimant has alleged."  (Tr. 542).  This violated SSR 96-7p, which forbids drawing such inferences "without first considering any explanations" for the claimant's noncompliance.  Id. at *8.

---

[9] When Plaintiff's mother tried to explain Plaintiff's history of medication-related side effects to the ALJ at the second hearing, the ALJ cut her off, saying it wasn't relevant because it did not relate to the period since July 2009.  (Tr. 681).

Finally, the fact that Plaintiff told Dr. Graham he would like to work is not evidence of his ability to work.   Inferring ability to work from desire to work is generally improper and especially hazardous where the claimant suffers from intellectual disability, because intellectually disabled individuals often overestimate their skills or try to hide their disability.   See James W. Ellis & Ruth A. Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L. Rev. 414, 430-41 (1985).

Thus, the ALJ committed numerous errors in finding that Plaintiff did not have the additional severe impairment required to meet Listing 12.05C.   As a result of these errors, his determination that Plaintiff had no additional severe impairment is not supported by substantial evidence.

## IV. Remedy

Plaintiff asks the Court to remand the case solely for an award of benefits, arguing that he meets Listing 12.05C as a matter of law.   (Doc. 18, pp. 29-30).   While Plaintiff's argument has some appeal, I find the more prudent course of action is to remand the case to the Commissioner for a redetermination of disability.   The evidence, particularly for the period of Plaintiff's adulthood, is limited, and not all of it supports a finding of disability.   I also recommend that on remand, the Commissioner consider assigning this case to another ALJ.

## V. Recommendation

Upon consideration of the foregoing, I respectfully recommend that:

1.   The Commissioner's final decision be **REVERSED and REMANDED** for further proceedings consistent with the findings in this report.

2.   The Clerk be directed to enter judgment accordingly and **CLOSE** the file.

3.    Plaintiff be advised that the deadline to file a motion for attorney's fees pursuant to 42 U.S.C. § 406(b) shall be thirty (30) days after Plaintiff receives notice from the Social Security Administration of the amount of past due benefits awarded.

4.    Plaintiff be directed that upon receipt of such notice, he shall promptly email Mr. Rudy and the OGC attorney who prepared the Commissioner's brief to advise that the notice has been received.

Specific written objections to this report and recommendation may be filed in accordance with 28 U.S.C. § 636, and M.D. FLA. R. 6.02, within fourteen (14) days after service of this report and recommendation.    Failure to file timely objections shall bar the party from a de novo determination by a district judge and from attacking factual findings on appeal.

**RESPECTFULLY RECOMMENDED** in Orlando, Florida on December 11, 2014.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

Presiding United States District Judge
Counsel of Record